UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 24 MAG 3556

<u>**SEALED COMPLAINT**</u>

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Violations of 18 U.S.C. §§ 924 and 2; 21 U.S.C. § 963 |
| JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," | |
| Defendant. | |

SOUTHERN DISTRICT OF NEW YORK, ss.:

DREW P. HATCH, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

<u>**COUNT ONE**</u>
**(Narcotics Importation Conspiracy)**

1.       From at least in or about February 2024, through in or about the date of the filing of this Complaint, in Guatemala and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

2.       It was a part and an object of the conspiracy that JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, and others known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

3.       It was further a part and an object of the conspiracy that JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

4.       The controlled substances that JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, conspired to (a) import into the United States and into the customs territory of the United States from a place outside thereof, and (b) manufacture, distribute,

and possess with intent to distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, were (i) 5 kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B), and (ii) 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of Title 21, United States Code, Section 960(b)(1)(H).

(Title 21, United States Code, Section 963; and Title 18, United States Code, Section 3238.)

## COUNT TWO
### (Use, Carrying, and Possession of Firearms)

5.      From at least in or about February 2024, through in or about the date of the filing of this Complaint, in Guatemala and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the narcotics importation conspiracy charged in Count One of this Complaint, knowingly used and carried firearms, and, in furtherance of such crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms.

(Title 18, United States Code, Sections 924(c)(1)(A)(i), 3238, and 2.)

## COUNT THREE
### (Conspiracy to Use, Carry, and Possess Firearms)

6.      From at least in or about February 2024, through in or about the date of the filing of this Complaint, in Guatemala and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

7.      It was a part and object of the conspiracy that JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the narcotics importation conspiracy charged in Count One of this Complaint, knowingly use and carry firearms, and, in furtherance of such drug trafficking crime, knowingly possess firearms, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

(Title 18, United States Code, Sections 924(o) and 3238.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.    I have been a DEA Special Agent since 2018.  I am currently assigned to the DEA Special Operations Division's Bilateral Investigations Unit, which focuses on international criminal activities, including international narcotics and weapons trafficking.  During my time as a DEA Special Agent, I have become familiar with some of the ways in which narcotics traffickers operate, and I have participated in numerous investigations involving international drug trafficking.  This affidavit is based upon my participation in the investigation of this matter, including my conversations with law enforcement agents and other individuals, my review of photographs and recorded communications, and my review of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview

9.    As set forth below, since in or about February 2024, the DEA has been investigating JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, a Guatemalan national, and others, for their involvement in international narcotics trafficking.

10.    In or about February 2024, a confidential source working at the direction of the DEA ("CS-1"[1]) began communicating with JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, about their potential partnership on future narcotics transactions.  Over the ensuing weeks, CS-1 and another confidential source working at the direction of the DEA ("CS-2,"[2] and together with CS-1, the "CSes") met and spoke numerous times with SOLORZANO and his co-conspirators—one of whom was armed with a pistol on at least two occasions.  During those meetings and calls, SOLORZANO and his co-conspirators explained that in addition to trafficking cocaine and other narcotics, they also had access to approximately 500 kilograms of methamphetamine in Guatemala for distribution.

11.    On or about March 19, 2024, SOLORZANO and his co-conspirators sold the CSes a test shipment of approximately 20 kilograms of methamphetamine out of their larger supply, for $4,000 upfront and with the understanding that the CSes would transport the narcotics to New

[1] CS-1 has been providing information to law enforcement since in or about 2010, in exchange for monetary compensation.  During that time, CS-1 has been deactivated as a confidential source twice, each time for less than one year, for reasons unrelated to CS-1's reliability.  Information provided by CS-1 in this investigation has been found to be reliable and has been corroborated by other evidence obtained by law enforcement.

[2] CS-2 provided information to law enforcement from in or about 2008 to 2010, and has again been providing information to law enforcement since in or about 2019, in exchange for monetary compensation.  CS-2 was previously convicted in the United States of a controlled substance felony offense in or about 2003.  Information provided by CS-2 in this investigation has been found to be reliable and has been corroborated by other evidence obtained by law enforcement.

York, sell the drugs there, and provide a portion of the proceeds to SOLORZANO and his co-conspirators. On or about April 10, 2024, DEA agents transmitted $9,500 to SOLORZANO and his co-conspirators via cryptocurrency, purportedly as the proceeds of the sale of five kilograms (of the 20-kilogram test shipment) of methamphetamine in New York.

12.    Subsequently, SOLORZANO agreed to a potential cocaine transaction with CS-1, whereby SOLORZANO and his co-conspirators would provide cash to CS-1, which CS-1 would use to purchase cocaine in Colombia, before then transporting that cocaine to New York for sale on SOLORZANO's and his co-conspirators' behalf. On or about October 4, 2024, SOLORZANO provided approximately $23,000 to CS-1 for this potential transaction, with the promise of additional money in the days to follow.

## The Investigation

13.    Based on my participation in this investigation, including my conversations with law enforcement agents, confidential sources, and other individuals; my review of DEA reports; and my review of recordings, draft transcripts, and summaries of undercover communications, I have learned the following, in substance and in part:[3]

### February 2024: Initial Meetings with SOLORZANO and Co-Conspirators to Discuss Narcotics Trafficking

a.    In or about February 2024, CS-1 was provided a phone number (the "Solorzano Number") from an individual ("CC-1"). CC-1 previously told CS-1 that CC-1 is involved in large-scale international drug trafficking, and further told CS-1 that the Solorzano Number belonged to CC-1's drug trafficking contact in Guatamala, and that CS-1 could contact the number to arrange future narcotics deals involving methamphetamine. CS-1 subsequently contacted the Solorzano Number and arranged a meeting in Guatemala City, Guatemala.[4]

b.    On or about February 4, 2024, CS-1 met, as planned, in Guatemala City, with the user of the Solorzano Number—subsequently identified as GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant[5]—and two other individuals ("CC-2" and

---

[3] Quoted and summarized portions of recorded communications referenced herein are based on my review of those communications, my conversations with confidential sources and other law enforcement officers about those communications, and draft transcriptions and translations of those communications that are subject to change.

[4] The communications between the CSes and GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, took place in Spanish.

[5] Initially, CS-1 believed SOLORZANO to be named "Victor Monroy Rivas." In or about August 2024, however, I was informed by Guatemalan law enforcement that they had determined that the individual CS-1 knew as "Victor Monroy Rivas" was in fact SOLORZANO. On or about August 28, 2024, CS-1 was provided by DEA agents with a known photograph of SOLORZANO and positively identified that person as the person CS-1 had previously identified to DEA agents as

"CC-3"). During the meeting, which was recorded, CS-1, SOLORZANO, CC-2, and CC-3 discussed the possibility of a future narcotics transaction involving methamphetamine. In particular, CC-2 stated that he was the financial backer for a "kitchen"[6] in Guatemala that had prepared 500 kilograms of methamphetamine for a buyer in Spain, but that the buyer had died before the sale was completed. SOLORZANO and CC-2 stated that they were looking for buyers, and that they had been informed by CC-1 that CS-1 was interested in purchasing product from them. CS-1 stated that CS-1 did not deal with methamphetamine directly, but had partners who did. In particular, CS-1 stated that CS-1 had a partner who worked in, among other places, the United States, including in New York. SOLORZANO, CC-2, and CC-3 agreed that CS-1's partner would purchase 10 kilograms of methamphetamine from them at the lower Guatemalan price, which would be transported to the United States, and SOLORZANO, CC-2, and CC-3 would put another 10 kilograms of product on this same shipment. They agreed that CS-1's partner would then sell those additional 10 kilograms in the United States and send the proceeds back to SOLORZANO, CC-2, and CC-3. CS-1 further observed that, during the meeting, CC-3 was armed with a pistol at his hip.[7]

c.      On or about February 27, 2024, CS-1 met again with SOLORZANO, CC-2, and CC-3 in Guatemala City. CS-2 also attended this meeting. During this meeting, which was also recorded, the group further discussed the narcotics transaction referenced during the prior meeting. Specifically, SOLORZANO and CC-2 discussed with the CSes that SOLORZANO and CC-2 would sell the CSes 10 kilograms of methamphetamine for $400 per kilogram, the prevailing price in Guatemala, and also provide an additional 10 kilograms of their own methamphetamine to be sold by the CSes in New York, at the prevailing price in New York. SOLORZANO and CC-2 stated that after the narcotics were sold, they would accept their share of the profits in cryptocurrency. CC-2 stated that he would use his family's concert promotion business to launder the drug proceeds, as he had done with approximately $700,000 previously. CC-2 also showed the CSes a photograph on his phone of at least approximately 20 transparent bags of what CC-2 stated was methamphetamine. CS-1 estimated that each bag was roughly the size of a standard pillowcase, and that each bag held approximately 10 kilograms of methamphetamine.[8] CS-2

---

"Victor Monroy Rivas," with whom CS-1 met in connection with this investigation, as described further herein.

[6] Based on my training and experience, I know that "kitchen" is a term frequently used by narcotics traffickers to refer to a location used to prepare methamphetamine.

[7] CS-1 believed the firearm to be a Glock 17, based on CS-1's prior observations of other Glock 17 firearms.

[8] During this meeting, SOLORZANO also described to the CSes his involvement, approximately five to seven years earlier, in trafficking at least 200 kilograms of cocaine from Costa Rica to Guatemala, which were then purchased by buyers from Mexico. SOLORZANO and CC-2 stated that they and CC-3 used individuals with rifles, specifically, "AKs" (which, based on my training and experience, I believe to be a reference to AK-47 assault rifles), to protect their narcotics shipments and as protection against law enforcement. SOLORZANO and CC-2 further described during the meeting their access to a supply of up to 25 kilograms per month of "2CB tusi," from individuals in Colombia, which SOLORZANO and CC-2 could then sell in Guatemala for $6,800 per kilogram. Based on my training and experience, I know that "2CB tusi" is also sometimes

further observed that during the meeting, CC-3 was carrying a pistol in his waistband area—as he had during the prior meeting on February 4, 2024.[9]

**March 2024: SOLORZANO Sells 20 Kilograms of Methamphetamine**

        d.      On or about March 11, 2024, the CSes met again with SOLORZANO and CC-2 in Guatemala City. During the meeting, which was recorded, SOLORZANO and CC-2 stated that they wanted to sell the CSes 24 kilograms of methamphetamine rather than the 20 kilograms previously discussed. SOLORZANO and CC-2 agreed that the CSes would pay $4,000 upfront, as payment for 10 of the 24 kilograms; that the CSs would sell seven of the remaining kilograms on behalf of SOLORZANO and CC-2, for $1,900 per kilogram; and that the CSes would then send the proceeds of those sales to SOLORZANO and CC-2 via cryptocurrency. The final seven kilograms would be given to the CSes to offset the costs of transporting the methamphetamine to the United States for resale. Prior to leaving the meeting, SOLORZANO and CC-2 provided the CSes with a sample of their supply of methamphetamine, which was subsequently laboratory tested and confirmed to contain approximately 46 grams of 98% pure methamphetamine.

        e.      On or about March 19, 2024, the CSes met again with SOLORZANO and CC-2 in Guatemala City. During the meeting, which was recorded, SOLORZANO and CC-2 stated that they had found another buyer for some of their methamphetamine, so they had brought only the 20 kilograms of methamphetamine originally discussed. The CSes provided SOLORZANO and CC-2 with $4,000, as previously agreed and as payment for 10 kilograms, and SOLORZANO and CC-2 then loaded 20 bricks of methamphetamine, a portion of which are pictured below, into a duffel bag brought by the CSes:

---

referred to as "pink cocaine," and that it typically contains ketamine combined with other drugs such as methamphetamine, cocaine, and/or opioids. During subsequent meetings, SOLORZANO and CC-2 discussed the possibility of SOLORZANO and CC-2 providing the CSes with a sample of this "tusi."

[9] During a subsequent telephone call between SOLORZANO and CS-1 on or about July 29, 2024, SOLORZANO stated, without further elaboration, that he had a .223 caliber rifle and a 12-guage shotgun that he kept for self-protection, and that the rifle came from a security company that he owned with another individual.



f.      CS-2 stated that the CSes would send the drugs "north" for sale, and that they anticipated sending SOLORZANO and CC-2 their portion of the proceeds within 15 to 20 days.  The CSes explained that since SOLORZANO and CC-2 had provided 20 rather than 24 kilograms of methamphetamine, the CSes would provide the proceeds from the sale of five kilograms, and the CSes would retain five kilograms to offset the transportation costs.  The substances sold by SOLORZANO and CC-2 to the CSes were subsequently laboratory tested and confirmed to contain approximately 19.81 kilograms of approximately 98% pure methamphetamine.

g.      During the meeting on or about March 19, 2024, SOLORZANO also stated that his brother worked in Colombia with a narcotics trafficker ("CC-4"), and together they moved cocaine from Colombia to Mexico in shipping containers.  SOLORZANO stated that CC-4 owed SOLORZANO approximately $300,000 for a past shipment of cocaine that SOLORZANO had assisted with, but for which SOLORZANO had never been paid.  Both SOLORZANO and CC-2 further described various other senior narcotics trafficking contacts they each purportedly had, seemingly to demonstrate to the CSes their connections in the drug trafficking world.

**April and May 2024:  SOLORZANO Receives Payment for the 20 Kilograms of Methamphetamine**

h.      On or about April 10, 2024, DEA agents made a $9,500 payment in cryptocurrency—purportedly for five kilograms of methamphetamine sold at $1,900 per kilogram, as previously agreed to and outlined above—from an undercover DEA bank account to an account provided to CS-1 by SOLORZANO.

i.      Later that day, on or about April 10, 2024, SOLORZANO called CS-1. During this call, which was recorded, SOLORZANO initially expressed disappointment with the amount that he and CC-2 had been paid for the 20 kilograms of methamphetamine.  CS-1 explained again that the CSes had paid $4,000 for the first 10 kilograms, at Guatemalan prices, but that another five kilograms were sold at the higher New York price of $1,900 per kilogram, and the proceeds from those five kilograms were sent to SOLORZANO and CC-2.  SOLORZANO confirmed that he and CC-2 had received the cryptocurrency payment from the CSes, noting that he and CC-2 were presently at the bank withdrawing the funds.  During the call, SOLORZANO

also spoke about a test shipment of 20 kilograms of cocaine that was purportedly set to arrive in Guatemala and offered to sell a portion of the shipment to CS-1.

        j.     The next morning, on or about April 11, 2024, CS-1 again spoke with SOLORZANO by telephone. During this call, which was recorded, SOLORZANO again explained that while he now understood the payment arrangement, he had wished to be paid more. SOLORZANO further stated that for the time being, he could not get close to the owners of the remaining supply of methamphetamine because the owners' family had recently been in the news and needed to keep a low profile.

**September and October 2024:  SOLORZANO Provides $23,000 for Cocaine Transaction**

        k.     During subsequent calls and meetings between SOLORZANO, CC-2, and the CSes, SOLORZANO and the CSes continued to discuss the payment arrangement for the 20-kilogram methamphetamine transaction previously completed, as well as the possibility of additional narcotics transactions involving not only methamphetamine, but also heroin, "tusi," *see supra* note 8, and cocaine.

        l.     On or about September 22, 2024, during a call between SOLORZANO and CS-1, which was recorded, SOLORZANO proposed that he and CC-2 could give money to CS-1 for CS-1 to purchase approximately 17 kilograms of cocaine in Colombia, which CS-1 would then transport to the United States—specifically, New York[10]—for sale on SOLORZANO's and CC-2's behalf.

        m.     On or about September 30, 2024, SOLORZANO and CC-2 met with CS-1 in Guatemala City. During the meeting, which was recorded, SOLORZANO and CC-2 stated that they were ready to provide CS-1 with money to purchase approximately 18 kilograms of cocaine in Colombia, as previously discussed with SOLORZANO, for a purchase price of $1,800 per kilogram. They further stated that, by the next day, they would have enough money (approximately $54,000) to purchase approximately 30 kilograms of cocaine. SOLORZANO and CC-2 also stated during this meeting that they knew a former Colonel of the Guatemalan military who owned a gun store and "protect[ed]" SOLORZANO and CC-2.[11]

        n.     On or about October 4, 2024, SOLORZANO again met with CS-1 in Guatemala City.[12] During this meeting, which was recorded, SOLORZANO handed CS-1 a bag

---

[10] Throughout their communications, CS-1 consistently indicated that New York was the location in the U.S. to which CS-1 would transport narcotics on SOLORZANO's behalf. Moreover, during the call on or about September 22, 2024, CS-1 mentioned transporting the narcotics to "the towers," which was a reference to New York.

[11] SOLORZANO and CC-2 did not identify the Colonel or provide additional information on the nature of the protection that he provided.

[12] SOLORZANO was accompanied by two individuals, including his son and an unidentified male. SOLORZANO's son did not participate in the discussions of future drug trafficking transactions.

containing approximately 180,000 Guatemalan Quetzals—worth approximately $23,000 and pictured below—which SOLORZANO stated was for the "14," referring to 14 of the kilograms of cocaine that CS-1 was to purchase in Colombia on SOLORZANO's behalf, and then transport to the U.S. for sale, as previously discussed with CS-1.  SOLORZANO further stated that he hoped to have more money to give CS-1 in the coming days, for an additional "12," *i.e.*, an additional 12 kilograms of cocaine.



And, after introductions were made, the unidentified male left the immediate area of the conversation, but stayed nearby where he watched SOLORZANO and CS-1.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of JUAN GUSTAVO SOLORZANO IMERI, a/k/a "Victor Monroy Rivas," the defendant, and that he be arrested, and imprisoned or bailed, as the case may be.

FURTHER, the Government respectfully moves for this Complaint and the associated arrest warrant to remain sealed, with the exception that this Complaint and the arrest warrant be unsealed for the limited purpose of disclosing the existence of or disseminating this Complaint and/or arrest warrant to relevant United States, foreign, or intergovernmental authorities, at the discretion of the United States and in connection with efforts to prosecute the defendant or to secure the defendant's arrest, extradition, or expulsion as otherwise required for purposes of national security.

S/ by the Court with permission
_____
DREW P. HATCH
Special Agent
Drug Enforcement Administration

Sworn to me through the transmission of
this Complaint by reliable electronic means
(telephone), this  8th day of October, 2024.

_____
THE HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

10